**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

|  |  |
|---|---|
| IN THE MATTER OF: | No. CV-20-00849-PHX-JAT |
| Swift Air, L.L.C. | **ORDER** |
| Debtor. | |
| Transjet Incorporated, | |
| Appellant, | |
| vs. | |
| MorrisAnderson & Associates Limited, | |
| Appellee. | |

Appellant Transjet Incorporated ("Appellant") appeals from the Judgment (the "Judgment"), (Doc. 1 at 9–12), and the Under Advisement Order (the "Under Advisement Order"), (Doc. 19-2 at 65–262),[1] entered by the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"). In support, Appellant filed an Opening Brief. (Doc. 11). Appellee MorrisAnderson & Associates Limited ("Appellee" or the "Trustee") filed a Brief in response, (Doc. 15), to which Appellant filed a Reply Brief, (Doc. 16). After

---

[1] This appeal relates to the appeals in *Swift Aircraft Management LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00854-PHX-JAT and *Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-00855-PHX-JAT (the "Redeye Appeal") (together with the present appeal, the "Related Appeals"). The appellants in the Related Appeals have briefed issues that cross all three Related Appeals in the appellants' Opening Brief in the Redeye Appeal as permitted by Fed. R. Bankr. P. 8014(e). Any citation of Docs. 19, 19-1, 19-2, 19-3, 19-4, 19-5, 19-6, 19-7, or 19-8 will refer to the appellants' Opening Brief and attachments in the Redeye Appeal.

1  reviewing the briefs and the record, the Court issues the following order.

2  **I.    BACKGROUND**

3          The below is a brief summary of the background of this case. A more extensive

4  discussion of the background can be found in the Under Advisement Order, (Doc. 19-2 at

5  75–116), and the appellants' Opening Brief in the Redeye Appeal, (Doc. 19 at 10–14).

6          Prior to December 21, 2011, Swift Air, LLC ("Swift" or the "Debtor") operated as

7  an aviation management company under a combined 14 CFR Part 121/135 Certificate

8  ("Part 121 Certificate" and "Part 135 Certificate") issued by the Federal Aviation

9  Administration ("FAA"). (Doc. 19 at 10). Swift's business involved managing aircraft

10 owned by other parties and booking charter contracts. (*Id.*). Swift maintained a Part 135

11 Certificate business which managed corporate/individual charter flights (the "Part 135

12 Business"), and Swift also maintained a Part 121 Certificate business which consisted of

13 flying large charter groups, in particular, professional sports teams (the "Part 121

14 Business"). (*Id.* at 11). Keeping the Part 121 Certificate operational required that certain

15 criteria be satisfied, such as having five specific positions filled by qualified employees

16 (the "Five Wise Men").[2] (Doc. 19-5 at 173–74).

17         Swift was a wholly owned subsidiary of Swift Aviation Group, Inc. ("SAG"). (Doc.

18 19-2 at 260). SAG also held all the equity interests in Swift Aviation Sales, Inc. ("Sales"),

19 Swift Aviation Management, LLC ("SAVM"), and Swift Aviation Services, LLC

20 ("Services"). (*Id.*). SAG was wholly owned by the Jerry and Vickie Moyes Family Trust

21 (the "Moyes Trust"). (*Id.*). Jerry Moyes ("Moyes") was the sole trustee of the Moyes Trust.

22 (*Id.*). The Moyes Trust also held all the equity interests in Transjet, Inc. ("Transjet"),

23 Transjet's three subsidiaries (the "Transjet Subsidiaries"), Transpay, Inc. ("Transpay"),

24 and SME Steel Contractors, Inc. ("SME"). (*Id.*). Moyes also personally owned fifty percent

25 of Redeye II, LLC ("Redeye"). (*Id.*). Moyes served as Swift's president, and Kevin

26 Burdette ("Burdette") served as Swift's vice-president. (*Id.* at 78). The companies owned

27 by Moyes and the Moyes Trust regularly did business with one another and through this

28 ────────────────
[2] The positions are Chief Pilot, Director of Operations, Chief Inspector, Director of Safety, and Director of Maintenance. (Doc. 19-5 at 174).

1    business incurred significant accounts receivable and accounts payable that were
2    outstanding on December 21, 2011. (*Id.* at 77–87).

3         The Transjet Subsidiaries each held title to Part 121 Certificate aircraft that were
4    managed by Swift pursuant to management agreements between Swift and each Transjet
5    Subsidiary (the "Management Agreements").[3] (Doc. 11 at 11–12). Under these agreements,
6    Swift operated the aircraft and received payment for this operation from Transjet, and any
7    charter revenue received by Swift would be paid to Transjet, less Swift's expenses and
8    commissions. (*Id.* at 12).[4] Prior to the transaction, due to the payments owed under the
9    Management Agreements and separate charter contracts, Swift built up both accounts
10   payable and receivable with Transjet. (*Id.*).

11        In 2011, Swift's balance sheet reflected liabilities greater than assets by more than
12   $3 million. (Doc. 19-2 at 88). In the latter half of 2011, Burdette met with two potential
13   buyers for Swift who ultimately did not purchase the company. (*Id.*). Then, in October
14   2011, Jeff Conry ("Conry"), on behalf of Avondale Aviation II, LLC and Jordan Gunthorpe
15   Holdings, LLC (collectively, the "Buyers"), approached Burdette about purchasing Swift's
16   Part 121 Business (the "Transaction"). (Doc. 19 at 11). Notably, the Buyers told Burdette
17   that they only wanted to acquire the equity in Swift's Part 121 Business and that they
18   intended to merge it with their recently acquired business, Direct Air, which needed a Part
19   121 Certificate. (Doc. 19-2 at 88–89). The Buyers also told Burdette that they planned to
20   obtain a $5 million investment in Swift after its acquisition. (*Id.* at 90).

21        The Transaction moved forward, terms were solidified, and the Buyers closed on
22   the purchase of the equity interest in Swift for a *de minimis* payment of $100 on December
23   21, 2011 (the "Transaction Date"). (Doc. 19 at 11–12). Swift's Part 135 Business was not
24   included in the Transaction, so it was transferred into a newly created entity, Swift Aircraft

25   _____

26   [3] Each Management Agreement is identical except for the name of the specific Transjet
     Subsidiary involved. (*See* Doc. 19-7 at 695).
27   [4] While the Management Agreements were with each of the individual Transjet
     Subsidiaries, the record shows that all transactions under the Management Agreements
     were handled by Transjet, (Doc. 19-3 at 212–15), and the Bankruptcy Court found that
28   "Transjet and/or the Transjet Subsidiaries were collectively owed [a payable] by Swift,"
     (Doc. 19-2 at 86).

Management, LLC ("SAM"). (*Id.* at 12). As part of the Transaction, Swift transferred certain assets and liabilities, including accounts receivable and accounts payable, associated with the Part 135 Business to SAM and SAG pursuant to the Part 135 Assignment and Assumption Agreement and Guarantee (the "Assignment and Assumption Agreement"). (*Id.* at 13). After the closing of the Transaction, Swift and the other Moyes owned companies executed an Inter-Company Settlement Agreement and Mutual Release (the "Settlement Agreement"). (*Id.*). The Settlement Agreement released Swift from any debts or obligations to the other Moyes owned companies and facilitated a transfer of assets and liabilities between Swift and certain other Moyes owned companies (the "Transfers"). (*Id.*). The Transfers included a receivable from SAVM (the "SAVM Receivable") and a receivable from Redeye (the "Redeye Receivable"). (*Id.*).

After the Transaction, the newly acquired Swift ("New Swift") experienced cashflow shortages. (Doc. 19-2 at 105). The $5 million investment that the Buyers planned to obtain for New Swift never materialized, and New Swift never merged with Direct Air. (*Id.* at 107). New Swift also entered into new post-Transaction contracts that exacerbated its money problems. (*Id.*). These and other problems led New Swift to commence a Chapter 11 bankruptcy proceeding on June 27, 2012. (*Id.*). New Swift emerged from its Chapter 11 bankruptcy proceeding through a confirmed restructuring plan in October 2013 after receiving approximately $6.3 million from Nimbos Holings, LLC ("Nimbos") in exchange for the equity interests in the reorganized New Swift. (Doc. 19 at 14).

On June 27, 2014, Appellee initiated the underlying adversary proceeding. (*Id.*). Appellee's Third Amended Complaint asserted, among other things, preference, fraudulent transfer, and breach of fiduciary duty claims against Appellant and others. (*Id.*). The Bankruptcy Court issued an Order Granting in Part and Denying in Part Motions for Summary Judgment (the "Summary Judgment Order") (Doc. 19-2 at 908–914) and held a trial after which the Bankruptcy Court issued the Under Advisement Order and the Judgment. (*Id.* at 8, 14). During the adversary proceeding, Appellant's expert, Grant Lyon ("Lyon") testified as did Appellee's expert, Michael Spindler ("Spindler"). (*See id.* at 23–

24).

Appellant appealed the Judgment and the Under Advisement Order. (Doc. 1 at 6). Appellant filed an Opening Brief. (Doc. 11). Appellee filed a Brief in response, (Doc. 15), to which Appellant filed a Reply Brief, (Doc. 16).

## II.    LEGAL STANDARD

The Court has jurisdiction over this case pursuant to 28 U.S.C. § 158(a), which provides that "district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158(a)(1). Matters referred to a bankruptcy court are classified as either "core" or "non-core" proceedings. 28 U.S.C. § 157(b). Core proceedings are those "arising under title 11, or arising in a case under title 11," and non-core proceedings are those that are "otherwise related to a case under title 11." *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 558 (9th Cir. 2012), *aff'd sub nom. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014). Bankruptcy court judges may enter final orders on all core proceedings and may submit proposed findings of fact and conclusions of law to the district court for entry of final orders on all non-core proceedings. *See* 28 U.S.C. § 157(b)–(c). Bankruptcy courts may enter final judgments in non-core proceedings "with the consent of all the parties to the proceeding." *Id.* § 157(c)(2).

Regarding final orders by a bankruptcy court, this Court reviews a bankruptcy court's decision for "abuse of discretion: 'The bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error.'" *In re Taylor*, 599 F.3d 880, 887 (9th Cir. 2010) (quoting *In re Straightline Invs., Inc.*, 525 F.3d 870, 876 (9th Cir. 2008)). "Thus, the first step of our abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009). "If the bankruptcy court identified the correct legal rule, we then determine whether its 'application of the correct legal standard [to the facts] was (1) illogical, (2) implausible, or (3) without support in

1    inferences that may be drawn from the facts in the record.'" *In re Taylor*, 599 F.3d at 887

2    (quoting *Hinkson*, 585 F.3d at 1262). "If the bankruptcy court did not identify the correct

3    legal rule, or its application of the correct legal standard to the facts was illogical,

4    implausible, or without support in inferences that may be drawn from the facts in the

5    record, then the bankruptcy court has abused its discretion." *Id.* at 887–88. Regarding

6    findings of fact, "'a finding is 'clearly erroneous' when, although there is evidence to

7    support it, the reviewing court on the entire evidence is left with the definite and firm

8    conviction that a mistake has been committed.'" *Hinkson*, 585 F.3d at 1260 (quoting *United*

9    *States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). The parties do not dispute that the

10   Bankruptcy Court had the authority to enter final orders in the instant appeal.

11   **III.    ANALYSIS**

12          Appellant makes four arguments in its opening brief: (1) the Bankruptcy Court erred

13   in determining that Appellant did not have recoupment rights in defense of Appellee's 11

14   U.S.C. § 547 preference claims; (2) the Bankruptcy Court erred in determining that

15   Appellant did not have setoff rights in defense of Appellee's 11 U.S.C. § 547 preference

16   claims; (3) the Bankruptcy Court erred by finding the Debtor insolvent at the time of the

17   Transfers under 11 U.S.C. § 547(b)(3); and (4) the Bankruptcy Court abused its discretion

18   in taking judicial notice of certain facts. (Doc. 19 at 16, 18, 21, 22). These arguments are

19   addressed below.

20          **A.    Appellant's Recoupment Rights**

21          Recoupment is an equitable doctrine that "'involves a netting out of debt arising

22   from a single transaction.'" *In re Straightline*, 525 F.3d at 882 (quoting *In re Harmon*, 188

23   B.R. 421, 425 (B.A.P. 9th Cir. 1995)). "It is applied when there are countervailing claims

24   arising from the same transaction strictly for the purpose of abatement or reduction." *In re*

25   *Harmon*, 188 B.R. at 425 (internal quotation marks omitted) (quoting *In re Hiler*, 99 B.R.

26   238, 243 (Bankr. D.N.J. 1989)). "The justification for the defensive use of recoupment in

27   bankruptcy is that there is no independent basis for a 'debt,' and therefore there is no

28   'claim' against estate property." *In re Coast Grain Co.*, No. ADV. 03-01466, 2006 WL

6810917, at *11 (B.A.P. 9th Cir. Jan. 31, 2006) (quoting *In re Harmon*, 188 B.R. at 425. Thus, "to the extent that a party is entitled to recoupment of funds, the debtor has no interest in the funds." *In re Azevedo*, 497 B.R. 590, 596 (Bankr. D. Idaho 2013). Because recoupment is based in equity, "courts should apply the recoupment doctrine in bankruptcy cases only when it would be inequitable for the debtor to enjoy the benefits of [a] transaction without meeting its obligations." *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1403 (9th Cir. 1996) (internal citations and quotations omitted).

A claim of recoupment "must arise from the *same transaction or occurrence* that gave rise to the liability sought to be enforced by the bankruptcy estate." *In re TLC Hosps., Inc.*, 224 F.3d 1008, 1011 (9th Cir. 2000) (emphasis in original). The Ninth Circuit employs a "logical relationship test" to determine whether events arise from the same transaction or occurrence. *Id.* at 1012 (citing *Newbery*, 95 F.3d at 1403). "Under the 'logical relationship' test, the word 'transaction' is given a liberal and flexible construction." *In re Madigan*, 270 B.R. 749, 755 (B.A.P. 9th Cir. 2001). The logical relationship test, however, should not "be applied so loosely that multiple occurrences in any continuous commercial relationship would constitute one transaction." *In re TLC*, 224 F.3d at 1012. "The rationale for allowing recoupment in contract cases is that it would be inequitable for the debtor to enjoy the benefits of a transaction without also meeting his obligations." *In re Madigan*, 270 B.R. at 758.

### 1.    The Bankruptcy Court's Recoupment Analysis

The Bankruptcy Court determined that Appellant could not assert recoupment to defend against Appellee's preference claims. (Doc. 19-2 at 186). When initially analyzing Appellant's recoupment argument, the Bankruptcy Court issued a bench ruling finding that there was not "just a transaction and everything arising out of that transaction," but that there was "a whole series of events and transactions occurring." (Doc. 19-7 at 696). This led the Bankruptcy Court to determine that "recoupment is not an appropriate defense here." (*Id.*). Thus, the Bankruptcy Court concluded that "the recoupment defense [was] going to be barred." (*Id.*). The Bankruptcy Court further noted in the Summary Judgment

Order that Appellant had not established a recoupment defense. (Doc. 19-2 at 914). In the Under Advisement Order, the Bankruptcy Court simply stated that "the Court agreed with [Appellee]'s argument that recoupment was not an appropriate defense under these circumstances. The [Bankruptcy] Court barred the recoupment defense [in the Summary Judgment Order] and sees no reason to now alter that earlier ruling." (Doc. 19-2 at 186).

The Bankruptcy Court's determination that there were "a whole series of events and transactions occurring," was based, in part, on the nature of the Management Agreements. (Doc. 19-7 at 696). The Management Agreements provided that Swift would be paid by the Transjet Subsidiaries a "Monthly Management Fee" of $25,000 on the first day of each month, and in return, Swift would manage the Transjet Subsidiaries' aircraft and charter operations. (Doc. 19-8 at 32, 47). The Management Agreements provide that Swift will pay the Transjet Subsidiaries all the proceeds from charter contracts, less Swift's expenses and commission, but the Management Agreements do not require that a certain number of charter contracts be made or that Swift perform any specific charter contracts. (*See id.* at 29, 36, 49). Notably, the acquisition of charter contracts is not required by the Management Agreements, and an absence of any performable charter contracts is not listed as a viable ground for termination of the Management Agreements. (*See id.* at 37–41).

## 2.    Appellant's Arguments

Appellant argues that the Bankruptcy Court erred in determining that Appellant did not have recoupment rights in defense of the preference claims because the Bankruptcy Court "ignored the controlling 'logical relationship' test for transactions announced by the Bankruptcy Appellate Panel for the Ninth Circuit in *Azevedo*." (Doc. 11 at 17 (citing *In re Azevedo*, 497 B.R. at 597)). While the Bankruptcy Court did not specifically cite the logical relationship test when ruling on recoupment, the Bankruptcy Court denied recoupment because there was not "just a transaction," but "a whole series of events and transactions." (Doc. 19-7 at 696). The Bankruptcy Court's analysis comports with the logical relationship test as the purpose of that test is to determine if claims arise from the same, or different, transactions than those creating the liabilities at issue.

Appellant contends that the application of the facts in this case to the logical relationship test should result in allowing for a recoupment defense. (Doc. 11 at 17–18). The central case cited by Appellant to support this contention is *In re Azevedo*. This case, however, is readily distinguishable from the instant matter. *In re Azevedo* concerned a cheese producer, Davisco, who advanced a milk supplier, Azevedo, $100,000 that was to be paid back via discounts on future deliveries over the course of a year. *In re Azevedo*, 497 B.R. at 593–94. After Azevedo received the advance, he filed for bankruptcy, and the bankruptcy trustee sought to recover the amounts discounted from the milk deliveries to Davisco during the pendency of the bankruptcy. *Id.* at 594. The *In re Azevedo* court held that the deductions were entitled to recoupment and were all part of a single transaction, in part, because the deductions all stemmed from "a single agreement" that outlined exactly what was to be paid and when. *Id.* at 599. The *In re Azevedo* court noted the particular importance of the fact that "this contract did not contemplate the possibility of future transactions between the parties. Rather, it was the transaction between parties." *Id.* Because of this, it was understood that "if Azevedo were to stop delivering milk, Davisco would deduct the full balance due on the advance from Azevedo's final milk payment." *Id.* at 594.

In the instant case, the receivables and payables were not created at one time under a single agreement, like the debt from the cash advance in *In re Azevedo*. Instead, they were created through the accumulation of the management fees, fees associated with the operation of the Transjet Subsidiaries' aircraft, the money owed on charter contracts, and other antecedent debts. (*See* Docs. 19-6 at 18, 19-7 at 652–53, 668). The Management Agreements specifically contemplated the possibility of future transactions—charter contracts—without requiring them. (*See* Doc. 19-8 at 36, 49). Even if customers stopped signing up for charters with Swift, Swift would not owe Transjet any additional or lump fees and the Management Agreements would continue to require the monthly management payments from Transjet. This is because the fees owed by Swift on the charter agreements, while part of the ongoing commercial relationship with Transjet, were fees from

agreements distinct from the Management Agreements. Thus, unlike in *In re Azevedo*, the preference claims against the Transjet accounts involve multiple separate contracts, rather than a single transaction.

Appellant also argues that *In re TLC* supports their position because, there, the Ninth Circuit noted that, in the Medicare system, "while [an] exchange of funds may stretch over an extended period of time, it remains part of a continuous balancing process between the parties." (Doc. 11 at 9 (citing *In re TLC*, 224 F.3d at 1012)). However, the *In re TLC* court made clear that its holding applied specifically to the "distinctive Medicare system of estimated payments and later adjustments" where "Congress rather clearly indicated that it wanted a provider's stream of services to be considered one transaction for purposes of any claim the government would have against the provider." *In re TLC*, 224 F.3d at 1012–13. The present case does not involve the complex Medicare system, and certainly does not come with an indication from Congress as to the nature of the transactions at issue. Thus, while *In re TLC* analyzes recoupment, its specific holding does not present a model for the instant case.

### 3.      Conclusions Regarding Recoupment

The Bankruptcy Court correctly identified that a claim of recoupment "must arise from the *same transaction or occurrence* that gave rise to the liability sought to be enforced by the bankruptcy estate." *In re TLC*, 224 F.3d at 1011 (emphasis in original). It was not illogical, implausible, or without support for the Bankruptcy Court to conclude that, rather than flow from the same transaction and occurrence, the payables and receivables at issue were the product of multiple contracts within an ongoing commercial relationship established by the Management Agreements. *See In re California Canners & Growers*, 62 B.R. 18, 20 (B.A.P. 9th Cir. 1986) (denying recoupment and holding that a distribution agreement that acted as the sole contract between parties created an ongoing commercial relationship under which future purchases of goods were separate transactions); *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918, 922 n.6 (Bankr. N.D. Cal. 1994) (denying recoupment and holding that, although party's reimbursement on all transactions was

- 10 -

governed by one overarching series of regulations, each reimbursement was a separate transaction under an ongoing commercial relationship).

Because the Management Agreements did not obligate either party to procure charter contracts, the Bankruptcy Court did not err in finding that payments on charter contracts were not the result of the same transactions or occurrences as the Management Agreements. *See In re Coast Grain*, 2006 WL 6810917, at \*12–14 (denying recoupment and holding that separate purchases under one ongoing commercial relationship arrangement were not part of the same transaction or occurrence because they were not required under the parties' arrangement). Although the individual Management Agreements created the commercial relationship between the parties here, it was not an abuse of discretion by the Bankruptcy Court to find that distinct contracts within that relationship are separate transactions and occurrences. *See In re Madigan*, 270 B.R. at 758–59 (denying recoupment and holding that distinct claims under one insurance contract were separate transactions).

Because the accounts in the recoupment claim do not involve the same transaction or occurrence as the accounts giving rise to Transjet's liability, it is not inequitable to deny Appellant's recoupment defense. Thus, the Bankruptcy Court did not abuse its discretion in determining that the defense of recoupment was barred here, so the Court affirms the Bankruptcy Court on this issue.

### B.    Appellant's Setoff Rights

Setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Newbery*, 95 F.3d at 1398 (quoting *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 19 (1995)). "The Bankruptcy Code provides for setoff" in 11 U.S.C. § 553. *In re TLC*, 224 F.3d at 1011 (citing 11 U.S.C. § 553). "Under setoff, mutual debts cancel each other. These debts may arise either from separate transactions or a single transaction but must be incurred prior to the filing of a bankruptcy petition." *Id.* (citing *5 Collier on Bankruptcy* ¶ 533.10, at 553-100 (15th ed. Rev. 1996)). In fact, "[t]he defining characteristic of setoff is that 'the mutual

- 11 -

1    debt and claim . . . are generally those arising from different transactions.'" *Newbery*, 95

2    F.3d at 1398 (quoting *4 Collier on Bankruptcy* ¶ 553.03, at 553–14 (15th ed. 1995)). The

3    party asserting a setoff right bears the burden of proof. *Id.* at 1399.

4           Arizona's law also recognizes setoff rights for certain claims. *See Murphy Farrell*

5    *Dev., LLLP v. Sourant*, 272 P.3d 355, 365 (Ariz. Ct. App. 2012) (discussing the application

6    of setoff to certain claims); *Summers v. Gloor*, 368 P.3d 930, 932 (Ariz. Ct. App. 2016)

7    ("The right of setoff or offset allows people or entities that owe each other money to apply

8    their mutual debts against each other, thereby avoiding the absurdity of making A pay B

9    when B owes A."). Such setoff rights can be waived via contract. *See In re Adamson*

10   *Apparel, Inc.*, 785 F.3d 1285, 1290 (9th Cir. 2015) (noting that a party can contractually

11   waive the defense of setoff).

12                    **1.      The Bankruptcy Court's Setoff Analysis**

13          The Bankruptcy Court denied Appellant's use of the defense of setoff, relying on

14   the waiver of setoff contained the Management Agreements. (*See* Doc. 19-2 at 185).

15   Specifically, the Bankruptcy Court relied on § 4 of the Management Agreements which

16   states, "[a]ll payments now or hereunder due or payment to [Swift] from [Tranjset] shall

17   be paid without offset, abatement, counterclaim, withholding, setoff or reduction for any

18   reason whatsoever." (*Id.* (quoting Doc. 19-8 at 33)). In determining that the language in

19   the Management Agreements controlled, the Bankruptcy Court found that the Management

20   Agreements could only be modified in writing, and that no evidence of a written

21   modification had been produced. (*Id.* at 185–86). That finding was based upon the language

22   of the Management Agreements at § 14(a) which states:

23          NO TERM OR PROVISION OF THIS AGREEMENT MAY BE
             CHANGED, WAIVED, DISCHARGED, OR TERMINATED EXCEPT BY
24          AN INSTRUMENT IN WRITING EXPRESSED TO BE A SUPPLEMENT
             TO OR AMENDMENT OF THIS AGREEMENT SIGNED BY THE
25          PARTIES, AND ANY WAIVER OF ANY OF THE TERMS HEREOF
             SHALL BE EFFECTIVE ONLY IN THE SPECIFIC INSTANCE AND
26          FOR THE SPECIFIC PURPOSE GIVEN.
27

28   (Doc. 19-8 at 43). Thus, the Bankruptcy Court concluded that the language of the

1   Management Agreements barred Appellant's use of setoff, and no writing had been used
2   to alter this language.

3                    **2.      Appellant's Arguments**

4         Appellant argues that the Bankruptcy Court erred in denying the defense of setoff
5   for multiple reasons. These reasons are that: Swift and Transjet modified or waived the no-
6   setoff provision in the Management Agreements by conduct, the Settlement Agreement
7   altered the Management Agreements, and the Bankruptcy Court acknowledged in the
8   Under Advisement Order that setoff had occurred. (*See* Doc. 11 at 18–20).

9                    **a.      Modification or Waiver Through Conduct**

10        To begin, Appellant asserts that the conduct of Swift and Transjet showed that the
11  Management Agreements had been modified or the right to enforce the no-setoff provision
12  had been waived because the Swift and Transjet "accounts were normally setoff against
13  one another in a clearing account at the end of every month." (Doc. 11 at 20 (citing Doc.
14  19-3 at 223–26)). Yet, any argument that the Management Agreements were modified or
15  any provision was waived by conduct would operate directly counter to the written
16  language in the Management Agreements allowing for modification or waiver only by an
17  instrument in writing. (*See* Doc. 19-8 at 43).

18        The Management Agreements, by their terms, are governed by Arizona Law; and
19  the parties do not dispute that Arizona law controls. (*Id.*). Under Arizona law, whether
20  parties intend to modify a contract "is a question of fact." *Wagner v. City of Globe*, 722
21  P.2d 250, 254 (Ariz. 1986). Similarly, waiver is also a question of fact. *See City Of Phoenix
22  v. Fields*, 201 P.3d 529, 536 (Ariz. 2009) ("Typically, waiver is 'a question of fact.'").
23  Thus, the Bankruptcy Court abused its discretion on this finding only if the finding is
24  clearly erroneous which means that, "although there is evidence to support it, the reviewing
25  court on the entire evidence is left with the definite and firm conviction that a mistake has
26  been committed." *Hinkson*, 585 F.3d at 1260. Here, the Court is not left with the definite
27  and firm conviction that a mistake has been committed.

28        Under Arizona law, when reviewing a contract, a court "must give meaning to all

the words and clauses used by the parties and it is not within its province to alter, revise, modify, extend or rewrite or remake an agreement." *Equitable Life & Cas. Ins. Co. v. Rutledge*, 454 P.2d 869, 871 (Ariz. Ct. App. 1969). The Management Agreements at issue clearly state that, "NO TERM OR PROVISION OF THIS AGREEMENT MAY BE CHANGED, WAIVED, DISCHARGED, OR TERMINATED EXCEPT BY AN INSTRUMENT IN WRITING EXPRESSED TO BE A SUPPLEMENT TO OR AMENDMENT OF THIS AGREEMENT SIGNED BY THE PARTIES . . . ." (Doc. 19-8 at 43). Thus, in determining that the Management Agreements had not been modified nor provisions waived by conduct, the Bankruptcy Court was simply "giv[ing] meaning to all the words and clauses used by the parties." *Rutledge*, 454 P.2d at 871.

To be certain, "[c]onduct can manifest acceptance of an offer or acquiescence in a modification." *Ancell v. Union Station Assocs., Inc.*, 803 P.2d 450, 453 (Ariz. Ct. App. 1990). However, mere conduct does not mandate that waiver or modification be found, but instead creates a question of fact to be analyzed by the trial court. *See Jones v. Cochise Cty.*, 187 P.3d 97, 104 (Ariz. Ct. App. 2008) (noting that waiver by conduct creates a factual question for the trial court). Conduct may also establish waiver of a right if it is "established by evidence of acts inconsistent with an intent to assert the right." *Am. Cont'l Life Ins. Co. v. Ranier Const. Co.*, 607 P.2d 372, 374 (Ariz. 1980). Previous waivers of a contract provision, however, do not necessarily modify a contract or require future waivers of that same provision. *See Coll. Book Centers, Inc. v. Carefree Foothills Homeowners' Ass'n*, 241 P.3d 897, 903 (Ariz. Ct. App. 2010) (finding that waiver of a contract provision in a particular circumstance did not limit subsequent enforcement of that same provision under the contract). The Management Agreements themselves echo this point by stating that, "ANY WAIVER OF ANY OF THE TERMS HEREOF SHALL BE EFFECTIVE ONLY IN THE SPECIFIC INSTANCE AND FOR THE SPECIFIC PURPOSE GIVEN." (Doc. 19-8 at 43)

So, even if Swift and Transjet had setoff their mutual debts in the past, such conduct does not necessarily work to modify the express writing of the Management Agreements

1    nor does it waive all future enforcement of certain provisions in the Management

2    Agreements. The Court additionally notes that, while there was testimony that the accounts

3    in question were normally setoff against each other every month, no such setoff occurred

4    in the month prior to the Transaction. (*See* Doc. 19-3 at 224–25).

5         When looking to all of the evidence, including the written language of the

6    Management Agreements that barred setoff, the requirement that waiver or modification

7    be made in writing, and the conduct of the parties, including the conduct in the month

8    before the Transaction, the Court is not left with the definite and firm conviction that a

9    mistake has been committed by the Bankruptcy Court in finding that provisions in the

10   Management Agreements were not modified or waived by conduct.

11                   **b.     The Settlement Agreement**

12        Appellant next argues that the Bankruptcy Court abused its discretion by finding

13   that there had been no waiver of the clause prohibiting setoff because Appellant presented

14   evidence that Swift and Transjet entered into a written modification of the Management

15   Agreements via production of the Settlement Agreement. (*See* Doc. 11 at 20). The

16   Settlement Agreement states that Swift and Transjet "release one another from any and all

17   actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds,

18   bills, covenants, contracts, controversies, agreements, promises, damages, judgments,

19   executions, duties, obligations, indemnities, claims and demands whatsoever . . . ." (Doc.

20   19-5 at 20). Appellant asserts that this language worked to release Swift and Transjet from

21   prior agreements and modified the parties' rights with respect to amounts due between

22   them, which would include the right to bar setoff under the Management Agreements.

23   (Doc. 11 at 20).

24        While the Settlement Agreement includes general release language, the

25   Management Agreements state that "NO TERM OR PROVISION OF THIS

26   AGREEMENT MAY BE CHANGED, WAIVED, DISCHARGED, OR TERMINATED

27   EXCEPT BY AN INSTRUMENT IN WRITING **EXPRESSED TO BE A**

28   **SUPPLEMENT OR AN AMENDMENT OF THIS AGREEMENT** SIGNED BY THE

1  PARTIES . . . ." (Doc. 19-8 at 43) (emphasis added). Nowhere in the Settlement Agreement
2  does it state that the Settlement Agreement is a supplement or amendment to the
3  Management Agreements, nor are the Management Agreements mentioned at all in the
4  Settlement Agreement. (*See* Doc. 19-5 at 18–25).

5      While the Settlement Agreement may contain a general waiver, the provision at
6  issue is in the Management Agreements which are governed by Arizona law. When
7  analyzing a contract under Arizona law, the Court must "look to the plain meaning of the
8  words as viewed in the context of the contract as a whole." *ELM Ret. Ctr., LP v. Callaway*,
9  246 P.3d 938, 941–42 (Ariz. Ct. App. 2010). The plain meaning of the language in the
10 Management Agreements clearly requires any modification or waiver to be in writing and
11 express that it is a supplement or amendment to the Management Agreements. The
12 Settlement Agreement does not expressly state that it is a supplement or amendment to the
13 Management Agreements. Thus, the Court is not left with the definite and firm conviction
14 that the Bankruptcy Court committed a mistake when it found that the language of the
15 Management Agreements was not modified by the Settlement Agreement or any other
16 writing.

17      c.    **The Bankruptcy Court's Acknowledgement that Setoff**
18           **Occurred**

19      Appellant further argues that the Bankruptcy Court itself acknowledged that the
20 accounts in question were setoff against each other as the Under Advisement Order states,
21 "the Transaction *effectuated a setoff* of Transjet Receivables ($1,802,668) against the
22 Transjet 135 Payable owed by Swift on the Transaction Date ($1,905,792)." (Doc. 11 at 20
23 n.11 (emphasis in original) (quoting Doc. 19-2 at 216 n.615)). Yet, the issue is not whether
24 Swift and Transjet acted to setoff their debts against each other, but the issue is whether
25 setoff was permitted under the Management Agreements such that setoff can be used by
26 Transjet as a defense to a preference action. The Bankruptcy Court found that setoff was
27 not permitted under the Management Agreements, so it was unavailable as a defense. After
28 reviewing the record, the Court is not left with the definite and firm conviction that the

1    Bankruptcy Court committed a mistake in making this finding.

2                    **3.    Conclusions Regarding Setoff**

3        The Bankruptcy Court correctly concluded that setoff rights can be waived via

4    contract. *See In re Adamson*, 785 F.3d at 1290. The record showed that the language of the

5    Management Agreements barred setoff, the Management Agreements required an express

6    writing for any modification or waiver, and, while the conduct of the parties may have been

7    to setoff debts in the past, debts between Transjet and Swift were not setoff in the month

8    prior to the Transaction. Based on this record evidence, it was not clearly erroneous for the

9    Bankruptcy Court to conclude that the defense of setoff was barred by the Management

10   Agreements.[5]

11       Because the defense of setoff was barred by the Management Agreements, it is not

12   inequitable to deny Appellant's setoff defense. Thus, the Bankruptcy Court did not abuse

13   its discretion in determining that the defense of setoff was barred here, so the Court affirms

14   the Bankruptcy Court on this issue.

15       **C. The Bankruptcy Court's Determination that Swift was Insolvent at the**

16          **Time of the Transfers Under 11 U.S.C. § 547(b)(3)**

17       The Court conducted a *de novo* review of this issue in the Redeye Appeal and

18   concluded, as the Bankruptcy Court did, that Swift was insolvent at the time of the

19   Transfers. *See Redeye II, LLC v. MorrisAnderson & Associates Limited*, Case No. CV-20-

20   00855-PHX-JAT, Section III.D.1 (D. Ariz. Dec. 1, 2020). Thus, the Bankruptcy Court did

21   not abuse its discretion in determining that Swift was insolvent that the time of the transfers,

22   so the Court affirms the Bankruptcy Court on this issue.

23       **D.    The Bankruptcy Court's Taking of Judicial Notice of Certain Facts**

24       The Court conducted a *de novo* review of this issue in the Redeye Appeal and

25   concluded that the Bankruptcy Court did not improperly take judicial notice of certain

26   facts, and even if it did, any error was harmless. *See Redeye II, LLC v. MorrisAnderson &*

27
28   _____
     [5] Because the Bankruptcy Court's finding that setoff was barred by the Management
     Agreements was not clearly erroneous, the Court need not analyze any findings made by
     the Bankruptcy Court regarding mutuality of obligations or whether Transjet was a
     subsequent transferee.

*Associates Limited*, Case No. CV-20-00855-PHX-JAT, Section III.D.5 (D. Ariz. Dec. 1, 2020). Thus, the Bankruptcy Court did not abuse its discretion by taking improper judicial notice of certain facts, so the Court affirms the Bankruptcy Court on this issue.

## IV.   CONCLUSION

Based on the foregoing,

**IT IS ORDERED AFFIRMING** the Bankruptcy Court's Judgment and Under Advisement Order in their entirety. Pursuant to Federal Rule of Bankruptcy Procedure 8024(a), the Clerk of the Court shall enter judgment accordingly.

Dated this 1st day of December, 2020.

James A. Teilborg
Senior United States District Judge